Michael Jungreis, ABA#7711184
Lily Ginsburg, ABA#2411117
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, AK 99501
Phone: (907) 222-7100
mj@reevesamodio.com
lginsburg@reevesamodio.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LARRY CASH, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CLAMAR FLOATS, INC )<br>)<br>Defendant. )<br>_____ ) | Case No. _____ |

## COMPLAINT

Larry Cash ("Plaintiff" or "Cash"), for his complaint against Defendant Clamar Floats, Inc. ("Defendant" or "Clamar Floats"), claims and alleges as follows:

## PARTIES

1. Plaintiff Larry Cash is a resident and citizen of the State of Alaska. He is a private pilot and flies airplanes for personal use.

2. Defendant Clamar Floats, Inc. is a Maine corporation having its principal place of business in Brunswick, Maine. Clamar Floats designs and manufactures straight and amphibious floats for experimental aircraft.

## JURISDICTION / VENUE

3. Subject matter Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff's damages exceed $75,000 exclusive of interest, costs, and attorneys' fees and because there is diversity between the parties given that Plaintiff is a citizen of the State of Alaska and Defendant is a citizen of the State of Maine.

4. The Court has personal jurisdiction over Defendant because (a) Clamar manufactured amphibious floats that were used by Cash in Alaska in its ordinary course of trade and gave rise to the injuries claimed herein; (b) Clamar Floats sold and transported a set of Clamar 2500 amphibious floats to Cash in Alaska and the injury and damage occurred in Alaska; (c) this action relates to the said floats actually received in Alaska by Cash from Clamar *See* AS 09.05.015(a)(4) & (a)(5)(E). Further, Defendant has sufficient minimum contacts with the State of Alaska because it promotes its business and engages in trade in this state, and therefore, the Court's exercise of personal jurisdiction over the Defendant is both fair and reasonable. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

5. Venue is proper under 28 U.S.C. § 1391(b)(2), 28 U.S.C. § 81A and Local Civil Rule 3.2 for the District of Alaska.

## FACTUAL ALLEGATIONS

6. Clamar Floats designs, manufactures, and services straight and amphibious floats for experimental aircraft. Clamar's internet site proclaims that its floats are for experimental aircraft.

7. In October 2021, the parties entered negotiations for Cash to purchase a Clamar Series 2500 Amphibious Floats ("the floats") from Clamar Floats for his experimental 4-

seat Piper Cub that was issued a Special Airworthiness Certificate by the FAA on July 4. 2022. The float were designed and manufactured by Clamar.

8. The negotiations resulted in a contract signed by both parties on October 18 and October 19, 2021.

9. The purchase price was $58,731 for the Series 2500 plus the cost of delivery and paint.

10. Plaintiff timely paid Defendant for sums owed under the contract.

11. The floats were shipped by Clamar and received in April of 2022, and were so damaged in shipping that they were unusable.

12. Clamar undertook repairs of the floats through Alaska mechanics, which took approximately a year. The paint on the floats was also defective and Clamar arranged for the repainting of the floats, which was completed in early 2023. This was followed by installation of the floats, which required input from Clamar and was not completed until late summer of 2023. Thus it was not possible to actually fly Cash's aircraft with the floats installed until late summer of 2023.

13. When practice landing on runways in fall 2023, (10/31 and 11/1) Cash and his instructor experienced that landings resulted in violent shimmying of the nose gear. Cash and his mechanic reported this to Clamar and received Clamar's assurance that the shimmy could be corrected. Cash and his mechanics endeavored to fix the shimmy without reliable/permanent success.

14. More time and experience flying with the floats revealed a substantial series of defects. These defects were life-threatening in that they could cause the aircraft to crash on runway/ground/water landings and take-offs.

15. Clamar erroneously installed a smaller main gear assembly on the left float than the right float. This erroneous installation of different sized main landing gear in the factory resulted in uneven loading of the landing gear and misaligned ground tracking for taxi, take-off and landings, increasing the likelihood of dangerous mishaps on the ground.

16. Due to a defect in the manufacture and/or design of the floats, both front landing gear legs collapsed simultaneously when Cash was taxiing on July 17, 2024, preparing to take-off, resulting in his aircraft being disabled in the taxiway. Clamar has never explained the defect that caused this collapse. This collapse could have been catastrophic.

17. The landing gear flair assist system malfunctioned repeatedly, while Cash was flying in the summer of 2024. Clamar then refused to introduce Cash to the expert in Alaska who had designed the flair assist system to assist with all the trial-and-error trouble shooting that Cash was paying for to try and fix the operation of the flair assist system. The "flair assist" system was a safety enhancement option that Clamar offered, Cash accepted, and paid extra for. ;

18. Brake fluid lines were inadequately attached to the brakes due to defective design relying on plastic brake lines. This resulted in failure of brakes on both floats (not at the same time) while Cash was taxing, disabling his aircraft on the taxiway, requiring 3rd party towing. Cash paid to have the plastic brake lines replaced with durable braided stainless steel brake lines and brakes functioned reliably after this correction.

19. Sealed nose wheel bearings were defective and lost lubricant leading to nose wheel/gear failure.

20. Nose wheel axles were resting on their threads leading to obliteration of the axle threads, loosening the axle/wheel assembly, resulting in violent shimmy and failure of the right nose wheel on a runway landing of 7/12/25.

21. Protective keel strips on both floats disconnected, leaving the keel strips dangling in the water from the bottom of the floats resulting in dangerous, unstable direcstional control of the floats for take-off and landing on water.

22. On August 11, 2025, Cash had the floats removed from his aircraft because they posed a life safety hazard and could likely have killed or seriously injured him and his passengers had he continued to fly his plane with these Clamar amphibous floats.

## FIRST CLAIM FOR RELIEF

### (Product Liability)

23. Plaintiff reallege and incorporate herein the allegations contained in the preceding paragraphs of the complaint.

24. The Series 2500 floats are defective as designed and/or manufactured by Clamar.

25. The floats, as designed and manufactured by Clamar, were unreasonably dangerous when used as intended.

26. The Series 2500 floats were unsafe when manufactured in accordance with Defendant's design.

27. Defendant defectively manufactured the floats because it negligently assembled the wrong parts on the floats it sold to Plaintiff.

28. The defects in design and/or manufacture caused Plaintiff's damages.

29. The conduct alleged herein constitutes negligence on the part of Defendant for designing, manufacturing, and selling a defective product, resulting in damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Breach of Warranty)

30. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs of the complaint.

31. Plaintiff has at all times been a consumer in the transaction at issue. He is not a professional pilot and purchased the floats for his personal aircraft.

32. Here, Clamar Floats negotiated the contract in Maine, executed the contract in Maine, designed and manufactured the floats in Maine, and held ownership of the floats while in transit because it took responsibility for damage to the floats while in transit from Maine to Alaska. Under these facts, Maine law should apply.

33. In addition, the parties' contract contains a "sales tax" provision that refers to the Tax Code for the State of Maine, indicating that Clamar Floats intended for Maine law to govern the contract. Restatement (Second) of Conflict of Laws § 187 comment a (1971).

34. Under Maine's Uniform Commercial Code, Defendant attempt to exclude implied warranties of merchantability and fitness for a particular purpose is unenforceable. Me. Rev. Stat. tit. 11, § 2-316(5).

35. The floats were not merchantable because they were defectively manufactured and did not conform to the affirmations of fact made by Defendant prior to sale.

36. The floats were not fit to be used as intendd because they presented an unreasonable risk to safety as designed and manufactured.

37. The floats were a hazard to life and limb.

38. The goods were not fit for a particular purpose because Defendant knew that Plaintiff wanted to use the floats on his personal aircraft and that Plaintiff, as a non-

professional pilot and a non-expert in the area of amphibious planes, was relying on Defendant to furnish equipment that would be fit to enable his plane to take off and land on water and/or ground (runways)

39. The floats were not fit to safely enable aircraft to take off and land on water or ground (runways) due to the defective design and/or manufacture of the floats.

40. Defendant misrepresented the quality, safety, and capabilities of the floats.

41. Defendant expressly warranted that the floats were the "strongest, most rugged and lightest floats in the industry" and that the "landing gear are all electric for the utmost in reliability and simplicity."

42. These express warranties created an affirmation or promise that the floats did not conform to.

43. The floats were neither safe, reliable, nor rugged, and Defendant breached its express and implied warranties to Plaintiff, causing Plaintiff's damages.

## THIRD CLAIM FOR RELIEF

### (Misrepresentation)

44. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs of the complaint.

45. Prior to sale, Defendant represented that the floats were the "strongest, most rugged and lightest floats in the industry" and that the "landing gear are all electric for the utmost in reliability and simplicity."

46. Defendant failed to use reasonable care when making these statements because it did not adequately test, inspect, and manufacture the floats, nor perform reliable tests to compare the safety, durability, and reliability of the floats with other models in the industry.

47. Plaintiff justifiably relied on these representations to his detriment because Clamar Floats specializes in the design and manufacture of floats while Plaintiff was entirely inexperienced with them, and the representations were false.

48. Plaintiff expended significant time and expense to try to modify/repair the defective floats or to make them safe to operate, in vain.

49. The floats present a hazard to life and limb and are poorly constructed.

## PRAYER FOR RELIEF

Having alleged the foregoing, Plaintiff Cash prays for relief as follows:

A. For a judgment against Defendant Clamar Floats for all damages caused by its breach of warranties, defective product, and misrepresentations in an amount in excess of $100,000;

B. For rescission of the purchase of the floats and restitution for all costs incurred in connection with that purchase, in an amount in excess of $100,000.

C. For fees and costs in bringing this suit to the full extent permitted by law;

D. For such other relief as the Court deems just and equitable.

Dated: October 15, 2025.

REEVES AMODIO LLC
Attorneys for Plaintiff

By: */s/ Michael Jungreis*
Michael Jungreis, ABA #7711184

By: */s/ Lily Ginsburg*
Lily Ginsburg, ABA #2411117
500 L Street, Suite 300
Anchorage, Alaska 99501
Telephone: (907) 222-7100
Emails: *mj@reevesamodio.com*
*lginsburg@reevesamodio.com*